RADER, Circuit Judge,
dissenting.
Relying on wholly irrelevant prior art and ignoring significant objective indicia of non-obviousness, this court substitutes its judgment on patentability for that of a *1340 jury. Lurking just beneath the surface of this court’s blindness to the underlying facts supporting non-obviousness is a bias against non-technical arts. No doubt, the invention of the transistor or of the polio vaccine came from more scientific fields and contributed more to the welfare of humanity. This court, however, cannot overlook that many individuals invest vast energies, efforts, and earnings to advance these nontechnical fields of human endeav- or. Those investments deserve the same protection as any other advances. The incentives for improvement and the protection of invention apply as well to the creator of a new hair-extension design as to a researcher pursuing a cure for cancer. In either case, the PTO and this court are charged with assessing the invention disclosure to determine its worthiness to receive a valuable, but temporally limited, exclusive right. Because this court dismisses this case so readily, I respectfully dissent.
As mentioned, this invention does not advance rocket science or cancer medicine. Still, for many individuals, this avocation wins vast devotion. The trading card industry was born in the late 19th century when tobacco companies began inserting images of baseball players into cigarette packs. Soon thereafter the trading card concept spread to other industries, most notably gum companies. Over the next century, the cards became standardized and sold in stand-alone packs without any tandem product, such as gum or peanuts. By the early 1990s, with competition intensifying, trading card companies introduced limited edition insert cards — e.g., autographed cards or holographic cards — to spark sales with the hope of acquiring a scarce and valuable asset.
The '501 patent was filed in 1994. Up until that point, not a single reference in over a century of history disclosed attaching a cut-up piece of a memorabilia item to a baseball card. The concept behind the invention was initially met with much skepticism. The major trading card companies, including the named defendants in this case, rejected Adrian Gluck, the inventor of the '501 patent. They reasoned, quite logically at the time, that the value of a particular memorabilia item depended on its physical preservation. Indeed, all the prior art suggested that the value of an item of memorabilia hinged on its condition. In better condition, the item brought maximum value; in worse condition, far less. Thus, the notion of cutting up an authentic player’s jersey into numerous pieces and attaching it to a trading card seemed sure to destroy far more value than it could ever create. According to the standard wisdom in this field, the dismembered jersey could not enhance the value of either the jersey or the card.
A year after Gluck approached Upper Deck with his idea, however, the company undertook an experiment and began selling limited edition cards with accompanying cut-up jersey pieces affixed adjacent to the player’s image. The new card product quickly became a hit with collectors and received praise throughout the formerly skeptical industry. One popular trade article opened with the following:
Can you imagine anyone cutting a game-used Dan Marino jersey into little pieces? Proud owners of such memorabilia probably wouldn’t even keep a pair of scissors in the same room as No. 13. But Upper Deck does.
For the Southern California company, combining sharp instruments with authenticated jerseys has been as successful as the combination of sports cards and memorabilia. Last month’s issue of *1341 Sports Cards Magazine had Upper Deck’s Game Jerseys and A Piece of the Action cards in the top two on the demand list for insert singles for baseball, hockey, football and racing.... Based on Upper Deck’s early success, it’s apparent that Game Jerseys are exactly what collectors wanted.
Another trade magazine clamored:
There was a time when spreading peanut butter and jelly between two slices of bread may have been an unthinkable combination. Today, millions of school children, and just as many grown-ups, rely upon the celebrated sandwich as a lunch-time staple.
So it goes with most ground-breaking ideas; an open mind plays an important role in developing a vision. Those who look beyond the ordinary can often see the future. Those who don’t simply mutter, “Why didn’t I think of that?”
The creative minds at Upper Deck search for that elusive gem every day, striving to provide collectors with the hobby’s version of the next PB & J. As for the company’s Game Jersey idea — a unique card set randomly inserted into all Series I packs of 1997 Upper Deck baseball — it’s not exactly edible. But, gauging from collector interest, it is desirable.
These excerpts are only a small sample from the record of the accolades for the Gluck invention. With various marketing campaigns and advertisement promotions touting the idea behind the '501 patent as their focal point, the newly-released cards became a staple of the industry. Using the invention, Upper Deck swept to the forefront of this new wave.
Without even so much as a cursory review of these unexpected results, the skepticism of experts, the commercial success, the flattery of copying, or any other objective facts, this court concludes in a rather passing fashion that the claimed invention would have been obvious at the time of invention based on the prior art references. But viewed in the context of the record as a whole, the prior art does not support that judgment as a matter of law.
Most important, none of the prior art references are remotely related to the sport trading card industry. The defendants’ failure to proffer any reference in the relevant field of invention is telling given the century-old history of this industry. Perhaps claim 1 can fairly be interpreted to include memorabilia items beyond the sporting world, but other asserted claims are expressly limited to sports trading cards. Thus, this court ought to seek at least some prior art in the primary field of its application and use. And the absence of any prior art in that area ought to speak volumes.
Setting aside the sports versus non-sports issue, each of the prior art references in this case is still distinctly different from the claimed invention. The Monroe reference discloses a diamond attached to a photo of Marilyn Monroe on a card. Unlike an authentic jersey worn by an athlete during a game or a match, the diamond itself has no inherent value derived from its “connection with historical, events, culture, or entertainment” as required by the district court’s construction for “memorabilia item.” Rather, the diamond itself attains cultural significance only when attached to a picture of Marilyn Monroe. In addition, the '501 patent teaches cutting a “memorabilia item” into “pieces.” The Monroe diamond is not a “piece” of any “memorabilia item” within the context of the '501 patent.
*1342 The Whittier reference discloses a cutup piece of a bed sheet once graced by one of the Beatles. The Whittier prior art reference attaches the scrap of cloth to a stationery paper with a statement of authenticity. It bears the date 1964. Besides the defendant’s admission that the bed sheet in one of its proffered exhibits is a fake, the reference also does not disclose any “trading card” or “photo” as those terms are used in the '501 patent. This reference has many differences besides its distant removal in time.
The Eckert reference is a “holy card” used to familiarize the public with a particular religious figure to promote that candidate for sainthood. A picture of a friar named Stephen Eckert appears on paper stock next to fabric represented as a piece of his clothing. As with the Monroe reference, it is a far stretch at best to say that Eckert discloses a “memorabilia item” as contemplated by the district court’s construction. Nor were “holy cards” purchased, traded, or valued like typical trading cards or “memorabilia items.” Their sole purpose was to increase the fame of the particular religious figure featured.
Finally, the James Dean reference features a picture of James Dean on a greeting card next to an undisputedly fake piece of the celebrity’s jeans. It is entitled, “Rebel’s Cause Lives: Ecstatic discovery! James Dean’s Jeans!” Despite defendants’ general admission that the prior art reference itself was intended as a joke, they still maintain that the reference would have motivated a skilled artisan to cut up a memorabilia item for a sports card. Quite the opposite, a reasonable inference could be made — which this court must credit on summary judgment — that the James Dean reference teaches away from the claimed invention for the very fact that it was a joke, a fake (not a “memorabilia item”), and, in many other ways, different from the claimed invention. In sum, the prior art references of record are each inherently different and lack much of the uniqueness and novelty of the claimed invention.
Finally, the record is dubious at best— particularly at this summary judgment stage — in suggesting that a person with skill in this art would even consider the four prior art references relied on by defendants, much less combine them. In that vein, this court cites primarily to defendants’ expert Scott Kelley to make the vast leap from these sketchy and different references taken in isolation. Mr. Kelly’s declaration, to my eyes, resounds with conclusory statements that lack any convincing reference to the actual record. To rely on such “expertise” without considering the countervailing factual evidence on record contravenes the role of a court at the summary judgment stage and gives accused infringers a free pass to avoid a jury’s judgment on the facts — in a sense, a get-out-of-jail-free card (no pun intended).
Plaintiff also proffered an expert, Henry Taylor, with credentials similar to those of Mr. Kelly but with opposite conclusions on obviousness. Why, on summary judgment, would this court give Mr. Kelly’s opinions more weight than those of Mr. Taylor? Is this an indication that this court views this field of art and this invention as unworthy of the full processes of the law?
In addition, this court’s analysis about the finite number of solutions in the art is unconvincing. Under this rationale, no party could receive a patent in the trading card industry because the solutions are “limited by the cards’ physical characteristics,” “theme,” and “physical confines.” In fact, as noted above, the trading card in *1343 dustry heralded this invention. Thus, the industry that best evaluates advances in its own field seems to question this court’s summary conclusion.